## COMMONWEALTH *against* SHEPARD.

3pw 509
40SC 186

The remedy for compensation, under the "Act for the purpose of adjusting the titles to land in Bedford and Ulster townships in Luzerne and Lycoming counties" is personal, and not to be assigned directly or indirectly. A conveyance of the land therefore, by the Pennsylvania claimant, will not entitle the grantee to maintain an action by virtue of the provisions of that act against the Commonwealth.

ERROR to the Common Pleas of *Bradford* county.

This was an action brought against the *Commonwealth* by *Job Shepard*, in pursuance of the provisions of the "Act for the purpose of adjusting the titles to land in *Bedford* and *Ulster* townships, in *Luzerne* and *Lycoming* counties," And the following case was stated, to be considered in the nature of a special verdict.

"On the 17th May 1785 a warrant issued to *Timothy Pickering, Samuel Hodgdon, Tench Cox* and *Duncan Ingraham*, for 400 acres of land, No. 32. On the 6th July, 1785, a survey of four hundred and thirty-one acres, was made in pursuance of said warrant, on the west side of *Tioga* river, about *Esther's Plains*, in district No. 18. then *Northumberland* now *Bradford* county, and situate in *Ulster*, one of the 17 townships named in the acts of assembly for adjusting *Connecticut* claims. On the 15th day of September, 1785, the said survey was returned into the surveyor general's office. On the 6th day of April 1785, articles of agreement were entered into between *Timothy Pickering, Samuel Hodgdon, Tench Cox, Duncan Ingraham, jr. Andrew Craigie* and *Myers Fisher* for the purchase of warrants, surveying and patenting lands in *Pennsylvania;* and appointing said *Pickering Hodgdon, Cox,* and *Ingraham*, trustees to procure warrants and transact business for the benefit of the company, under the limits,

(Commonwealth *v.* Shepard.)

and to the extent set forth in the said articles of agreement, which are copied and herewith annexed, as a part of this case.

The aforesaid trustees are all dead leaving heirs, but *Timothy Pickering* was the survivor for several years, and afterwards died, having first made his last will and testament, duly executed and proved, appointing *John Pickering* and *Octavius Pickering* his executors, who accepted and gave bonds, in which will and testament, *inter alia*, is the following clause: "I also hereby give to my said executors, full power to sell, and by good and sufficient deeds to convey all my lands in the states of *Pennsylvania* O-*hio*, *Virginia* and *Kentucky*, and all my right and interest in said lands, or any of them, placing the moneys received therefor at interest, or in some productive stock or funds." The said will was dated the 15th day of May, 1827; and proved the third Tuesday of February, 1829. The said *Timothy Pickering* also left sundry children, of whom the said *John Pickering* was and is the eldest son. On the 21st day of May, 1830, the said *John Pickering* (describing himself as the eldest son and heir at law of the said *Timothy Pickering*,) executed a power of attorney to *Putnam Catlin* to sell and convey the said tract of land on the on the 29th July, 1830, *John Pickering*, aforesaid, by his attorney in fact, *Putnam Catlin*, executed a deed for the said land to *Job Shepard* the plaintiff. In 1831 (since suit brought and since the award of arbitration in this cause) the said *John Pickering* and *Octavius Pickering*, describing themselves as executors of *Timothy Pickering* deceased, with power to sell lands by their attorney in fact *Putnam Catlin*, executed a deed for the said land to *Job Shepard* the said plaintiff.

The introduction of the deed from the executors of *Timothy Pickering* to the plaintiff, since suit brought, is to be received as having the same force as if executed before suit brought.

On the 28th July 1812 two patents issued, one to *Frederick Green* for one hundred and twenty-three acres of said land, and the other to *Isaac Morley*, for one hundred and fifty acres and one hundred and twenty-two perches, of said land; in pursuance of certificates issued under an act of assembly, to adjust the titles to land in *Bedford* and *Ulster* townships in *Luzern* and *Lycoming* counties, passed the 19th March 1810, being lot No. 9, and parts of lots, Nos. 10, 11, 12, amounting together to two hundred and seventy-four acres, and one hundred and twenty-two perches and covering two hundred and twenty-seven and a half acres of land, covered by the warrant first above mentioned, the quantity for which the plaintiff claims compensation. *Green* had been in posession of the part covered by his patent twenty-four years before suit brought, and *Morley* had been in possession of the part covered by his patent twenty-three years before suit brought; and

(Commonwealth *v.* Shepard.)

others of whom they brought the *Connecticut* title, had been in possession of the respective parcels aforesaid twelve years before the entry of the said *Green* and *Morley*. *Abner Murray*, on the trial of the cause before the arbitrators, swore, that he had been in possession of the residue of the *Pickering* warrant twenty-four years before suit brought; holding the same for the period afore-said, under the *Connecticut* title, adversely to the *Pennsylvania title*, and without certificate and patent under *Pennsylvania*.

Part of the claim for compensation is founded upon evidence of the value of the land, as land, and part of the said claim is founded upon evidence of the value of certain water rights, and mill privileges and landing on the bank of the river *Susquehanna*.

If upon these facts a verdict might legally be rendered for the defendant, then judgment to be so entered with costs of suit; if the court are of a contrary opinion, then judgment to be entered for the plaintiff for the said sum of eighteen hundred and twenty dollars forty-four cents and costs of suit.

The following is the agreement referred to in the special verdict:

Articles of agreement indented and made the 6th April, 1785, between *Timothy Pickering* of the city of *Philadelphia* Esq. of the first part, *Samuel Hodgdon* of the same city esq. of the second part, *Tench Cox* of the same city, merchant, of the third part, *Duncan Ingraham* jr. of the same city, merchant of the fourth part, and *Andrew Craigie* of the city of *Few York*, druggest of the fifth part, and *Miles Fisher*, esq. of the sixth part. Whereas the land office of *Pennsylvania* is expected to be opened on the first day of May next, for the sale of the lands within this state, lately purchased from the Indians, and the parties to these presents, are desirous to form a company for the purchase of a considerable quantity of said lands for their joint account, in the proportions and terms of conditions hereinafter mentioned. Now it is witnessed by these presents, that the said parties, each one for himself, his executors and administrators, doth covenant, promise, grant and agree to and with the others and the surviver of them, his executors, administrators and assigns, in manner and form following, that is to say, 1st, The said *Timothy Pickering* and *Samuel Hodgdon*, and each of them, shall furnish two eighth parts of the whole into eight equal parts to be divided, and the said *Tench Cox*, one equal eighth part, and the said *Duncan Ingraham*, one equal eighth part, and the said *A. Craigie* one equal eighth part, and the said *Myers Fisher* one eighth part of all the public certificates and securities which shall be necessary and sufficient to purchase from the said Land Office the quantity of sixty-three thousand acres of the said lands, on or before the said first

day of May next; and the like proportions of so much and suffi-
cient monies to pay and defray all other expenses that shall accrue,
in the course of procuring complete titles by patents from the
same.  2. That *Timothy Pickering, Samuel Hodgdon, Tench
Cox* and *Duncan Ingraham,* be, and they are hereby appointed
a committee of the said company, to manage the said business, in
their own names, but for the use of all the parties aforesaid.  And
they do covenant and promise, that being furnished with securi-
ties and certificates aforesaid, they will on the first day of May
next apply to the Land Office, and procure so many warrants as
shall be thought most advisable, for such quantities of acres in
each warrant, as will in the whole make up the said number of six-
ty-three thousand acres, in the names of themselves, if the rules
of the Land Office will admit thereof, and if not, then in the names
of such of their friends as will be forthwith willing to convey the
said warrants to them; and in that case, will cause and procure the
warrants, and the lands therein mentioned, to be conveyed to them
*as joint tenants in* fee  3d. That the said committee will contract
with *James Potter,* esq. of *Pennsylvania,* or some other suita-
ble person or persons acquainted with the country, to explore the
same, and find out proper places to locate the said warrants, to
shew the surveyor of the district of country where they lie,
and to attend at the time of surveying the same, and to procure re-
turns thereof to be made to the Surveyor General's Office, in or-
der for patenting; for all which services, they shall allow the per-
son or persons performing them, such proportion of the said lands,
and to be divided to him by lot, in such manner as they shall
agree upon, binding such person or persons that they shall not be
concerned in locating any other lands, until this agreement shall
be fully perfected, and that if any of the said lands by him shewn
and surveyed, shall be lost by means of prior location or surveys,
he or they shall procure an equal quantity to be surveyed in some
other place or places within the said purchases with any addition-
al expense *to the parties to these presents or any of them.*  4 That
so soon as the said surveys shall be completed and returned, the
said committee or trustees, or the survivors of them, shall cause to
be conveyed to the said person or persons so much of the said
lands, and in such manner and form as shall be specified in their
said agreement.  5. That so soon as patents shall be obtained, the
said trustees shall be and stand seized of the residue of the said
lands, to and for the *uses* and *purposes hereinafter mentioned,*
that is to say as two equal eighth parts thereof to and for the prop-
per use and behoof of the said *Timothy Pickering,* his heirs and
assigns forever; as to two other eighth parts thereof to and for
the said *Samuel Hodgdon,* his heirs and assigns forever; as to
one other eighth part, to and for the proper use and behoof of the

(Commonwealth *v.* Shepard.)

the said *Tench Cox* his heirs and assigns forever; one-eighth to *Ingraham;* one-eighth to *Craigie;* and one-eighth to *Fisher;* which said lands shall be accordingly divided into such proportions and *balloted* for by the said parties or their representatives, their heirs or assigns respectfully, and the lots or devisions to each of them respectively happening, shall be conveyed by the said trustees or the survivors or survivor of them to the others or their heirs in fee simple. 6th, It is expressly agreed between all the said parties, that there shall be no benefit of survivorship among them, but that notwithstanding all the sale lands shall be vested in the said trustees as joint tenants in fee, yet all the said parties, their representatives, heirs or assigns, shall have a vote or votes, in proportion to the quantity they have respectfully held, in all the transactions of the company; and if either of them be minded to sell his share before the said division shall take effect, he shall notify his intention, with the lowest price he will take, to the company, and allow them twenty days to consider thereof, and if they refuse the same, then, and not before, he shall be at liberty to sell to others and the trustees shall make conveyance accordingly. But they shall not be bound to make conveyances to others, but after a previous offer to and refusal by the company. 7th, If a majority of the company, shall agree before the division be made, to sell any part or parts of the lands to any person or persons on their joint account, the trustees shall make conveyances accordingly, and the money arising from such sales shall be divided among all the parties, their executors, administrators and assigns, in proportion to their several shares herein above expressed.

8. All agreements made by the trustees in pursuance of these presents, or by virtue of any future determination of the majority of the company, shall bind and enure to the benefit of all the parties to these presents, their heirs and assigns, as fully as if they were all parties to such agreements, the vesting the said lands and the powers herein contained in the said trustees and their survivors, being only intended to prevent inconveniences arising from absences or deaths, when the heirs may be under age, or incapable of acting. And for the true performance of all and singular the covenants and agreements aforesaid, the said parties and each of them, bind themselves, and each and every of their heirs, executors and administrators, unto the other of them, his and their heirs, executors, administrators and assigns, firmly by these presents.

In witness whereof, &c &c.

The court below rendered a judgment for the plaintiff.

ERRORS ASSIGNED:

1. In deciding that the representatives of *Timothy Pickering,*

65

(Commonwealth *v.* Shepard.)

survivor, &c. could convey in violation of the trust, such a perfect title as would enable his vendee to recover in an action which necessarily works a total destruction of the estate.

2. That the plaintiff might recover compensation from the Commonwealth, although he could not recover the land, by reason of an adverse possession of thirty or forty years.

3d. That the jury could not legally presume a release or an abandonment in support of a possession of thirty-six years.

*E. Lewis,* for plaintiff in error.

*Williston,* for defendant in error.

The opinion of the court was delivered by

GIBSON, C. J.—Granting for the sake of the argument, what we do not decide, that the right of action was in *Timothy Pickering,* as surviving trustee, and subsequently in his executors, the question is whether it can have been transferred to the plaintiff, not by an open and direct assignment, for that will not be pretended, but incidentally, by a conveyance of the land for which compensation is demanded? Under a conveyance in 1830 from *John Pickering,* the heir at law, and another in 1831 from the executors of *Timothy Pickering,* the plaintiff sues for compensation in the character of a Pennsylvania claimant of land certified and patented to *Connecticut* settlers in 1812, when undoubtedly the right to demand compensation by action, existed complete in those who were the owners at the time. According to a principle of the common law, a naked right of action is not assignable; and the principle is peculiarly applicable to a right of action against a sovereign, which is a personal concession. The state certainly never intended to make these rights a subject of traffic, or to subject herself to an action by those whose personal responsibility might be an inadequate security for the costs. Unless then, there was an estate in the Pennsylvania claimant, undivested, by the adverse certificate and patent, nothing could pass by his conveyance. Strictly speaking indeed, a right of action, perfect at the time, does not pass even as an incident of the estate; as for instance an action of trespass, which must be brought by him who was the owner at the time of the injury. An instance more in unison with the case before us, would be the assignment of an action for the breach of a warranty, by a conveyance of the evicted land. But not to insist on that, I should deem the case not only a plain one on principle, but as being unattended with any particular difficulty in point of authority, were it not for the decision in *Evans* v. *The Commonwealth,* 2 *Serg. & Rawle,* 441, which it is necessary to encounter.

(Commonwealth *v.* Shepard.)

There it was assumed, that the divesture of the title is incomplete before compensation actually made, and that the measure of it is the value of the land at the trial, and not at the time of the eviction; and these propositions being the converse of each other, are in effect the same. The case differed from the present in this, that compensation or the means of obtaining it, was not provided for several years ; and this was viewed as a material circumstance, as it would have been viewed below, had it not been considered that the design of the legislature in subsequently giving an action, was to remove the well grounded complaints of the Pennsylvania claimants, whose titles were posterior to the Decree of *Trenton*, in putting them, by relation of time, exactly on a footing with those whose titles were prior to it; and that such claimants were bound to take the remedy on the implied, but necessary condition, of not contesting the legality of the previous proceedings, or claiming to be put on more advantageous ground than were their fellows, whose titles had been indisputably divested.    As a ground of decision, however, the want of a provision for immediate compensation was ultimately abandoned for the broad ground of imperfect divesture, till compensation actually had; and this latter ground was necessary to the decision, under the circumstances of that case, as the conveyance, by force of which the plaintiff was suffered to recover, was still subsequent to the act by which the action was provided; and in that aspect the original withholding of the remedy could not affect the question: consequently it was decided on ground which is common to all cases under these acts.

An intent to refer the question of divesture and value to the period of the trial, was thought to be inferrible from two provisions in the acts themselves, as well as from the nature and fitness of the thing.    In the first place, compensation is directed to be assessed "without taking into view any improvement made thereon;" and these words were understood as specially referring to improvements made between the certificate and the trial.    Had improvements not been made by the settler previous to the certificate, the inference that the words were inserted to prevent the Pennsylvania claimant from obtaining compensation, by virtue of a supposed *abiding ownership* for improvements subsequent to the certificate, would have been a plausible one, as they would have had no other subject for their operation.    But it is notorious, that the lands had been improved by settlers under *Connecticut* for half a century; and the clause was evidently introduced to prevent the Pennsylvanian from claiming for the settler's labor previous to the certificate, and not to provide for the infinitely less important subject of improvements between the certificate and an action that was expected to follow; and a vast majority of cases did follow, hard upon it.    That this was in truth the object, is well known to those who are acquainted with

the history of the controversy, and the legislation it occasioned. Another provision, particularly relied on, is the requirement of proof by the claimant "that he *is* fully, fairly, and exclusively entitled to the land under the Commonwealth, except as against the person or persons claiming the same by virtue of a certificate or patent granted under the authority of this act; and from this it has been thought, that though the settler may hold under his certificate and patent against all the world, the Pennsylvania claimant is nevertheless entitled, by virtue of his primitive ownership, against every body else. According to this hypothesis, two distinct and available titles to the same estate, or rather two distinct and available fee-simple estates in the same land, are supposed to exist at the same time in different persons—a state of things, which, if it were practicable, it certainly was not the object or the policy of the legislature to encourage. Unless the proceedings under the divesting provisions were an usurpation, and the patent void, the estate of the Pennsylvanian would be a barren one, unless in the single event of a failure of inheritable blood on the part of the settler, and then the land would escheat, not to the Commonwealth, but to the Pennsylvanian—a consequence that no one will pretend would follow. As to his hopes of being eventually permitted to recover the land from the settler, after the latter had paid for it, on the guaranty of the state, that would involve such a breach of the public faith, as to put every hope of any thing but compensation, out of the question. For what purpose, then, can the legislature be supposed to have suffered the Pennsylvania title to remain? Not to keep up the original irritation betwixt the Pennsylvania claimants and the settlers, by preserving the cause of it, in order to frustrate the main design of the act—the pacification of the country. The supposition is moreover drawn, not only from a literal interpretation of the words, but in opposition to the evident object of the clause, which was to provide for conflicting pretensions under *Pennsylvania,* the plaintiff being bound to prove himself exclusively entitled at the time of eviction, in order to secure the compensation to the true owner. In *Miller* v. *Dwilling,* 14 *Serg. & Rawle,* 442, a similar construction was attempted to be made of the act for the gradual abolition of slavery, in which it is provided that "every negro or mulatto child, born within this state, after the passing of this act, who would, *in case this act had not been made,* have been born a servant for life or a slave, shall be deemed to be, and shall be, by virtue of this act, the servant of such person or his assigns, who would in such case have been entitled to the service of such child, unto the age of twenty-eight years; whence an attempt to hold to servitude the child, not of a slave, but of a servant till twenty-eight, on the plea, that but for the act in question, it would have been born a slave, because the mother would have been a slave. But it was determin-

ed, for convincing reasons, expressed by the Chief Justice who delivered the opinion of the court, that notwithstanding the literal and positive import of the words, none but the child of one who was actually a slave at the birth, could be held as a servant. So, notwithstanding the clumsy language of the legislature, the word *"is"* having been put for the words *"would have been,"* it is equally clear that no one was intended to be brought within the purview, who was not the Pennsylvania owner at the time of the certificate. The special provisions of these acts, then, leading to no definite conclusion in respect to the particular question, it is left to general considerations, arising from the nature of the proceedings.

By the constitution, no man's property "shall be taken or applied to public use without the consent of his representatives, and without *just* compensation *made;*" and, in accordance with this principle, the legislature has directed the compensation in cases like that before us to be just.    On the principle of the common law, that performance shall be taken to have been perfected as to him whose negligence or refusal to accept prevented it: compensation is made, within the meaning of the constitution, whenever it is tendered. Unless the divesture were complete when the land was granted to the settler, and compensation tendered to the Pennsylvanian as assessed by the commissioners or to be assessed, at his election, by a jury, the patent could not constitutionally have protected the former from the title of the latter, and the proceeding would have been a mockery.    Was it not complete, then, when an immediate right of action was given for it, which would have been nugatory without a cause of action existing?    If the origin of this cause of action is to be referred to the time of embracing the remedy, by the election of the claimant to consider himself for the first time disseised, then no divesture of title could be made without the consent of both parties, and private property could not be taken for public use at all, if the owner should persist in refusing compensation.    Such a principle would not only put it in his power to defeat the constitutional provision altogether, but give him the unreasonable advantage of choosing his time, and recovering according to the enhanced value at the time of the action.    But the constitution and the legislature have directed a *just compensation*, which, it is supposed, can necessarily be made but in reference to the value at the trial; for it was remarked; "If my land is to be valued according to the usual price ten years ago, and in the mean time the usual price has risen fifty per cent., it is clear, that to pay me according to the price ten years ago, is making me but one half of compensation."

Nothing ever came from the author of this remark, without a strong claim to respect, and consistently with that, it is fair to say, that the very matter in controversy seems to have been assumed; for it cannot accurately be said that *my* land has risen in price, if it

(Commonwealth *v.* Shepard.)

ceased to be mine before the beginning of the rise. Taking the title to have been divested ten years before, to have valued the land according to its price at the trial, would have been as unjust to the state in the event of a rise, as it would have been to the claimant in the event of a fall. It cannot be supposed that the legislature intended him to bear a loss from depreciation; yet that would be inevitable, on the ground assumed. It is the value at the time of eviction that is material to the question; and it seems to me the principle of compensation for a covenant of warranty broken, is strictly analogous, and bears directly on the present case. That the measure is the value at the time of the warranty, results, not from the agreement, but the law, settled as it is, on the abstract principles of justice and the fitness of things, the value of the land at the particular time and not the time itself, being dependent on the terms of the contract. And the principle seems to be of universal application. In the *Schuylkill Navigation* v. *Thoburn*, 7 *Serg. & Rawle*, 411, the standard of compensation for a statutory licence to flood the land of an adjoining occupant, was deemed to be the value of the injury at the moment of its complete developement, and consequently without regard to an increase of it, by reason of a rise in the value of the land. The measure of damages too, for not delivering goods purchased, is their value at the day specified for delivery and not afterwards. *Meason* v. *Phillips*, *Addison's Rep.* 246. *Edgar* v. *Boies*, 11 *Serg. & Rawle*, 445. The application of the same principle to the time of divesture, in a case like the present, can scarce be doubted; and that time would seem to be the period when the claimant and the state first assumed the attitude of vendor and vendee, or disseisor and disseisee. Notwithstanding, then, our sincere respect for the admitted learning and ability of the judges by whom *Evans* v. *The Commonwealth* was decided, we are constrained to say, the remedy for compensation is personal, and not to be assigned directly or indirectly. No one pretends to suspect, that the conveyance was designed to operate on what was ostensibly to be the subject of it; and to suffer it to operate as the assignment of a mere right of action for the compensation given in lieu of the land, would be contrary to a maxim of the common law, *quod fieri vetatur per directum, vetatur etiam per obliquum*. The interpretation may have been influenced by the extreme hardship of the confirming acts as regards the Pennsylvania claimants, which I can duly appreciate, having been among the sufferers. But the principles of the law seem to point to a different conclusion. Had the rule of that case become a rule of property, I would have been the last man in the world to disturb it, but we are not aware, that any case has arisen, in which it would have been followed as a precedent, and there seems to be little danger of retroactive inconvenience, from the substitution of a different one.

(Commonwealth *v.* Shepard.)

We decide no more than that compensation cannot be recovered in the name of the present plaintiff; but whether an action may not be maintained in the name of the grantor's executors, is a question which it is at present unnecessary to decide, and about which we intimate no opinion.

Judgment of the court below reversed and judgment here for the defendant.